FILED

SEP 10 2025

Clerk of the Appellate Courts
REc'd By _____

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2025

## IN RE ALEXANDER P.

**Appeal from the Juvenile Court for Greene County**
**No. 24-J-30684          Kenneth N. Bailey, Judge**

_____

### No. E2024-01714-COA-R3-PT
_____

In this case involving termination of the adoptive mother's and father's parental rights to their child, the Greene County Juvenile Court ("trial court") determined that the statutory ground for termination—severe child abuse—had been proven by clear and convincing evidence. The trial court further determined that clear and convincing evidence demonstrated that termination of parental rights was in the child's best interest. The parents have appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JEFFREY USMAN and VALERIE L. SMITH, JJ., joined.

T. Hunter Shelton, Greeneville, Tennessee, for the appellant, Arlan P.

Catherine Fezell, Greeneville, Tennessee, for the appellant, Sheila P.

Jonathan Skrmetti, Attorney General and Reporter, and Jason R. Trautwein, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

On August 2, 2024, the Tennessee Department of Children's Services ("DCS") filed a petition in the trial court ("the Termination Petition") seeking to terminate the parental rights of the adoptive parents, Sheila P. ("Mother") and Arlan P. ("Father"), to their minor child, Alexander P. (the "Child"). The Child was five years old when DCS filed the Termination Petition. Mother and Father, who were the Child's biological grandparents,

adopted him in 2023. The Child had lived with Mother and Father until June 20, 2024, when he was taken into DCS protective custody by order of the trial court following the arrest of both parents. On that date, Mother and Father had been arrested and charged with "maintaining a dwelling where drugs are used or sold, possession of firearms during the commission of a dangerous felony, and sale and delivery of schedule I drugs[.]" The charges against both parents were subsequently dismissed in September 2024 due to a typographical error in the search warrant that had been executed upon the parents' residence on June 19, 2024. The Child has remained in DCS custody since removal from the parents' residence.

In the Termination Petition, DCS alleged that the parents had committed severe child abuse against the Child, in violation of Tennessee Code Annotated §§ 36-1-113(g)(4) and 37-1-102(b)(27), because the parents had been found "to be in possession of 8-10 grams of methamphetamine, baggies and digital scales," had been "using their residence for the purpose of selling illegal drugs," and had been found "to be in possession of approximately 30 rifles and handguns." DCS also alleged that clear and convincing evidence demonstrated that termination of Mother's and Father's parental rights was in the Child's best interest.

On October 17, 2024, the trial court conducted a hearing on the Termination Petition. Both parents and their respective counsel attended the hearing, as did Cynthia Tannert, the guardian *ad litem* who had been appointed for the Child. The trial court heard testimony from Greene County Sheriff's Department Detective Chuck Humphreys, DCS case worker Caleb Rowland, and DCS child abuse investigator Crystal Gibson.

On October 31, 2024, the trial court entered a written order terminating Mother's and Father's parental rights to the Child. The trial court found, by clear and convincing evidence, that the Child had been a victim of severe abuse, as defined by Tennessee Code Annotated 37-1-102(b)(27), and that clear and convincing evidence demonstrated that termination of parental rights was in the Child's best interest. Both parents timely appealed.

## II. Issues Presented

The parents have each filed an appellate brief through his or her respective counsel. Mother presents the following issue for our review, which we have restated as follows:

1.     Whether the trial court erred by terminating Mother's parental rights when there was no direct evidence that Mother had severely abused the Child and when all of the evidence admitted was circumstantial, had been gained through an invalid search of the parents' home, and was insufficient to meet the "clear and convincing" standard required for a finding of the ground of severe child abuse.

2

Father presents the following additional issues, which we have restated slightly:

2. Whether the trial court erred in finding, by clear and convincing evidence, that Father had committed severe child abuse.

3. Whether the trial court erred in finding, by clear and convincing evidence, that termination of Father's parental rights was in the Child's best interest.

III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see*

3

*also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.; In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Statutory Ground of Severe Child Abuse

Tennessee Code Annotated § 36-1-113[1] delineates the statutory requirements for termination of parental rights, providing in relevant part:

---

[1] Unless otherwise noted, throughout this Opinion, all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the Termination Petition was filed and not to any other version of the statute. *See, e.g., In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at \*4, n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, such as this one, the subsection that was in effect at that time the Termination Petition was filed has not changed and therefore remains current.

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4. . . .

* * *

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interest of the child.

Here, the trial court concluded that the evidence clearly and convincingly demonstrated that Mother and Father had committed severe child abuse against the Child by exposing the Child to methamphetamine, heroin, and loaded firearms in the parents' residence. Tennessee Code Annotated § 36-1-113(g)(4) provides that this ground has been proven when:

The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

As relevant to this cause of action, § 37-1-102(b)(27) (West July 1, 2024, to current) defines "severe child abuse" as:

(A)     (i)     Exposure of a child to serious bodily injury or death, or the risk of serious bodily injury or death, caused by brutality, abuse, neglect, or use of force; and

(ii)     As used in this subdivision (b)(27)(A), "serious bodily injury" has the same meaning as "serious bodily injury to the child" given in § 39-15-402[.]

Concerning this ground, the trial court determined:

5

There was only one ground pled which was severe child abuse. The Respondents chose not to testify so the Court must rely on the testimony of the witnesses presented by [DCS] in this case.

The Court notes that pursuant to *In re A.L.H. et al.*, No. M2016-01574-COA-R3-JV[, 2017 WL 3822901] (Tenn. [Ct.] App. 2017), the facts in that case show that the mother did not test positive for any substance; however, two of her three children did and the Court of Appeals states that it is the obligation of the parents to protect the child from abuse and exposure of the child to methamphetamine is a form of severe child abuse.

The Court finds that the search warrant that was found to be insufficient by the District Attorney does not affect the civil case. The pictures presented in this case speak volumes. A photo is worth a lot in this case and there are multiple photographs of multiple firearms including an AR15 sitting in a tennis shoe and laying against a guitar. There were rifles standing against a door. There were photographs of drugs laying in the open and foil with drug residue laying in the open. Detective Humphreys testified that based upon his experience these substances were very likely heroin and methamphetamine. There was methamphetamine laying on a subwoofer. On the clothes dryer there was a digital scale and baking soda. These pictures show drug paraphernalia laying throughout the residence. Neither parent took the stand to dispute that these items were not theirs. The child tested positive for a significant amount of methamphetamine and cocaine and based upon the statute and the case law the Court can find that testing positive on a hair follicle drug screen is sufficient for a finding of severe child abuse.[2]

T.C.A. § 37-1-102(b)(27) defines "severe child abuse" to include the following:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

(ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).

---

[2] The hair follicle drug screen was administered to the Child on July 15, 2024, twenty-five days after he was removed into DCS custody.

The Court in the *In re A.L.H. et al.*, case indicates clearly that the severe abuse comes from the child being exposed to substances including methamphetamine due to the impact it has on the development of a child.

The Court finds that these parents must have been aware of the methamphetamine and guns laying around the home and they did not dispute any of the testimony presented. Therefore, the Court finds that the child was a victim of severe abuse by clear and convincing evidence and turns its attention to the best interest factors having found that a ground for termination exists.

Mother argues that the trial court erred by finding that Mother had severely abused the Child because, according to Mother, the evidence that there were illicit drugs in the parents' home was "circumstantial, supplied from an invalid search of the [parents'] home, and not enough to meet the heightened statutorily required standard of clear and convincing[.]" In support of her argument, Mother asserts that it is "unclear from the record if the substances found during [the June 19, 2024] search were confirmed to be illicit or illegal because the termination hearing was conducted before the lab results had been returned." In addition, Mother contends that there was no direct evidence that the firearms discovered in the home "were stored improperly" or that they were "within the reach of the minor child before the search began."

Concerning circumstantial evidence of severe child abuse in a parental rights termination case, our Supreme Court has stated:

> We have rejected any suggestion that circumstantial evidence is inferior to or less probative than direct evidence. *See State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011) (citing 2A Charles Alan Wright & Peter J. Henning, *Federal Practice & Procedure* § 411 (2009)); *cf.* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 42.03(a) (2022) ("Do not assume that direct evidence is always better than circumstantial evidence. According to our laws, direct evidence is not necessarily better than circumstantial evidence. Either type of evidence can prove a fact if it is convincing enough."). Circumstantial or not, evidence is evidence, and we consider it all.

*In re Markus E.*, 671 S.W.3d 437, 468 (Tenn. 2023). Thus, Mother's argument that the trial court should not have considered circumstantial evidence in determining the ground of severe child abuse in this case is unavailing.

Moreover, the trial court reviewed evidence that was both direct and circumstantial to reach its conclusion. This Court has defined direct and circumstantial evidence as follows:

7

Direct evidence is defined by Tennessee Courts as "evidence that 'proves a fact, or group of facts, without an inference, and which in itself, if true, conclusively establishes that fact.'" *Brenner v. Textron Aerostructures*, 874 S.W.2d 579, 585 (Tenn. App. 1993) (quoting *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 445 (Tenn. 1992)). Circumstantial evidence, on the other hand, is evidence which "'proves a fact from which an inference of the existence of another fact may be drawn.'" *Id.* (quoting *Otis*, 850 S.W.2d at 445).

*Paschall v. Henry Cnty. Bd. of Educ.*, No. W1999-0070-COA-R3-CV, 2000 WL 33774557, at *4 (Tenn. Ct. App. June 2, 2000). "Direct evidence may consist of testimony of a person who has perceived by the means of his or her sense the existence of a fact sought to be proved or disproved." *State v. Keen*, 31 S.W.3d 196, 218 (Tenn. 2000) (quoting the trial court's jury instructions concerning the general nature of direct evidence); *see State v. Dotson*, No. E1999-00640-CCA-R3-CD, 2000 WL 528404, at *12 (Tenn. Crim. App. May 3, 2000) (quoting with approval the trial court's jury instructions concerning the relationship between direct and circumstantial evidence: "For example, if a witness testified that the witness [s]aw it raining outside, that would be direct evidence that it was raining. If a witness testified that the witness saw someone enter a room wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.").

Here, the trial court reviewed photographs of Mother's and Father's home taken by Detective Humphreys on June 19, 2024, in tandem with Detective Humphreys' eyewitness testimony concerning their contents. The photographs and Detective Humphreys' testimony constituted direct evidence of the contents of Mother's and Father's residence. *See Keen*, 31 S.W.3d at 218; *Dotson*, 2000 WL 528404, at *12. Detective Humphreys also identified several firearms in the photographs that he had personally observed when he searched the residence, some of which he verified as having been loaded and within the reach of the Child on the date of the search. In addition, DCS offered as proof a detailed catalogue of the firearms that Detective Humphreys had found in the residence, which also constituted direct evidence that loaded firearms were present in the home on the date of the search. *See id.* Significantly, as the trial court noted, neither Mother nor Father took the stand to dispute the presence of loaded firearms, drugs, and drug paraphernalia in their home.

During his testimony, Detective Humphreys acknowledged that the substances that he had identified as illicit drugs had been "sent off to the lab" but that the results had not yet been returned to him. As stated above, Mother argues that because of this, it is "unclear from the record if the substances found during [the June 19, 2024] search were confirmed to be illicit or illegal[.]" However, Detective Humphreys testified that he believed the substances he found in the parents' residence to be methamphetamine and heroin based upon his "experience" in the field. The record demonstrates that at the time Detective

8

Humphreys executed the search warrant on Mother's and Father's residence, he had been employed with the Greene County Sheriff's Department for over twenty years, during which he had received annual training on drug identification and had personally conducted many similar searches.

The trial court also reviewed the results of a "hair follicle" drug test that had been administered to the Child on July 15, 2024. The Child had tested positive for methamphetamine and cocaine on that date.[3] Although the Child was in DCS custody when the test was administered, the positive drug screen results constituted circumstantial evidence which the trial court properly considered, *see In re Markus E.*, 671 S.W.3d at 468, and from which the trial court drew an inference that the Child had been exposed to methamphetamine while in Mother's and Father's care, *see Paschall*, 2000 WL 33774557, at *4. The photographs, Detective Humphreys' testimony, the firearm catalogue, and the Child's positive drug screen results together constituted both direct and circumstantial evidence that the Child had been exposed to illicit drugs and multiple firearms while in the home with the parents.

As this Court has determined, a finding of severe child abuse turns not on the method or level of exposure, but on the "fact that the [Child] was exposed to drugs." *See In re A.L.H.*, No. M2016-01574-COA-R3-JV, 2017 WL 3822901, at *4 (Tenn. Ct. App. Aug. 31, 2017). Detective Humphreys testified that he observed methamphetamine in Mother's and Father's residence and that the Child had access to the drugs in the home. In addition, there was photographic evidence corroborating Detective Humphreys' testimony, and the Child tested positive for methamphetamine shortly after he was removed from the parents' custody. Thus, contrary to Mother's assertions, it was not necessary for Mother to have tested positive for drugs to determine that the parents had subjected the Child to severe child abuse. *See id.* ("It is the exposure of the child to harm that matters, not the method or level of exposure.").

Mother next asserts that because the evidence of drugs was "supplied from an invalid search of [Mother's and Father's] home," the trial court erred by relying on that evidence to determine that Mother and Father had committed severe child abuse against the Child. Mother refers here to Detective Humphreys' testimony that the search warrant he executed on June 18, 2024, at the parents' residence contained typographical errors that resulted in dismissal of the related drug charges against both Mother and Father. DCS counters that because Mother cites "no legal authority" in support of this argument and

---

[3] Mother argues that the results of the hair follicle test were not sufficient for a finding of severe child abuse because the test was taken while the Child was in DCS custody and while he was "in an abusive foster home." We acknowledge that the test was administered twenty-five days after the Child had been removed into DCS custody. However, we note that the Child's testing positive for methamphetamines is consistent with the photographic evidence and Detective Humphreys' testimony concerning the presence of methamphetamine in Mother's and Father's home on the date of removal.

9

provides "no analysis, leaving it to DCS and the Court to make the argument for her," she has waived the issue pursuant to Tennessee Rule of Appellate Procedure 27(a)(7).

Tennessee Rule of Appellate Procedure 27(a) mandates that an appellant's brief must include "[a]n argument . . . setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities and appropriate references to the record . . . relied on[.]" Tenn. R. App. P. 27(a)(7)(A) (emphasis added). By failing to develop her argument with an analysis supported by citations to legal authority and the record, Mother has not complied with Rule 27 regarding her search warrant argument, and the argument is therefore waived. *See Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012) (explaining that an issue may be deemed waived when it has been expressly raised as an issue, but the brief fails to include an argument satisfying the requirements of Rule 27(a)(7)).

Even had Mother not waived her argument concerning the faulty search warrant, this Court has long adhered to the principle that the "exclusionary rule generally does not apply to a civil proceeding" wherein the government is not seeking to exact a penalty on or punish a person. *City of Jackson v. Butler*, 10 S.W.3d 250, 253 (Tenn. Ct. App. 1999). Thus, the trial court did not err when it found that "the search warrant that was found to be insufficient by the District Attorney does not affect the civil case." Accordingly, Mother's argument on this point is without merit.

In determining that "there was heroin and methamphetamine found in the home," the trial court expressly stated that in addition to considering the testimony and evidence presented, the court was "drawing a negative inference due to the parents choosing not to testify to dispute any of the evidence presented in this case." Father argues that this was error, asserting that a trial court only has discretion to draw a negative inference from a party's decision not to testify "once there is an invocation of the Fifth Amendment of the United States Constitution." Father does not offer any legal authority in support of this argument.

Although Father is correct that "in parental termination cases, the court is permitted to draw a negative inference from a witness's invocation of his or her Fifth Amendment right.," *see In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *5 (Tenn. Ct. App. Apr. 23, 2020) (citation omitted), we find no authority that supports Father's additional supposition that a party must expressly invoke the Fifth Amendment before a court may draw a negative inference from that party's refusal to testify. Rather, in a termination proceeding, this Court has stated that "there is no constitutional infirmity in the ability of the trial court to draw a negative inference from the parent not testifying or to consider evidence obtained over the parent's Fifth Amendment objection in a proceeding to terminate that parent's parental rights." *In re Nickholas E.*, No. M2009-01888-COA-R3-PT, 2010 WL 454809, at *6 (Tenn. Ct. App. Feb. 9, 2010) (following the "result and reasoning" in *State Dep't of Children's Servs. v. F.R.G.*, No. E2006-01614-

10

COA-R3-PT, 2007 WL 494996, at * 10-12 (Tenn. Ct. App. Feb.16, 2007)) (emphasis added). Thus, we find no error in the trial court's decision to draw a negative inference from the parents' decision to not testify. Even had the trial court erred by drawing such negative inference, we would deem such error to be harmless because DCS presented clear and convincing evidence that Father and Mother had exposed the Child to methamphetamine and loaded, improperly stored firearms, and thus had committed severe child abuse against the Child.

In the absence of testimony from either Mother or Father, the trial court relied upon testimony from Detective Humphreys, photographs taken during the search of the residence, and the Child's positive drug test results to conclude that the Child had been exposed to illicit drugs and loaded firearms and had therefore been subjected to severe child abuse as contemplated by § 37-1-102(b)(27)(A). As stated above, Detective Humphreys testified that when he entered the residence, he had "found methamphetamine" and what he "believed to be heroin residue in aluminum foil." Detective Humphreys further stated that he "also found some pills and 20 to 30 firearms just standing in corners and laying on beds." The photographic evidence also included images of what Detective Humphreys described as a "set of digital scales open, sitting on the [clothes] washer"; a substance that "appear[ed] to be methamphetamine laying on top of the freezer, along with a torch and some knives, and a few baggies"; "what appears to be a meth rock just out in plain view, a foot off the ground"; "a little short bump stock AR rifle that was loaded" with its barrel "in a shoe sitting on the ground"; and "aluminum foil" that "appeared to have, what looked to be heroin residue" in the "living room." Detective Humphreys testified that he found the parents and the Child at the residence on that day, such that the substances he identified as illicit drugs and the loaded firearms were within reach of the Child.

Upon careful review, we find that the trial court did not err in finding that Mother and Father had committed severe child abuse against the Child through the "knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death," namely, exposure of the Child to methamphetamine, heroin, and at least one loaded firearm in the Child's home. *See* Tenn. Code Ann. § 37-1-102(b)(27). Accordingly, we affirm the trial court's determination that this ground had been established by clear and convincing evidence.

## V. Best Interest of the Child

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the

11

trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2021, to current) lists the following factors for consideration:

(A)     The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on

12

these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

13

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the

14

circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final judgment, the trial court weighed several of the best interest factors in favor of terminating Mother's and Father's parental rights. Upon our thorough review of the evidence presented, we determine that the trial court's findings regarding the best interest factors are supported by a preponderance of the evidence.

The trial court considered each factor individually and initially determined that factors (A), (B), (D), (E), (F), (G), (H), (I), (K), (L), (M), (S), and (T) were not applicable to this case and therefore did not weigh in favor or against termination. Concerning factors (D), (E), (F), (G), (I), (K), (M), (S), and (T) there was no evidence presented related to these factors during trial; therefore, we will not disturb the trial court's determination that these factors are not applicable and do not weigh for or against termination. However, we disagree with the trial court's determination that factors (A), (B), (H), and (L) do not apply to this case, and we will address each in turn.

Concerning factor (A)—the effect a termination of parental rights will have on the child's critical need for stability and continuity of placement—and factor (B)—the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition—the evidence demonstrated that a termination of parental rights would likely have a positive effect on the Child's critical need for stability and his emotional and psychological well-being. As discussed above, DCS presented evidence that Mother's and Father's home was filled with illicit drugs, loaded firearms, and extreme clutter and disarray at the time of removal, exhibiting a physical environment that was unstable and unsafe for the Child. Mr. Rowland, the DCS caseworker, also testified that when the Child was removed into DCS custody, he had not yet been potty trained although he was nearly five years old. This is an indicator that the Child suffered developmental delay while in the care of Mother and Father. According to Mr. Rowland, the Child had subsequently become potty trained in the few months after he had been taken into DCS custody. Concerning the Child's developmental delays in other areas, Mr. Rowland explained that at the time the Child was removed into protective custody, he "struggle[d] with social interaction with any age level" and had been specifically "physically combative" at doctor visits. As factors (A) and (B) pertain to Father

specifically, Father had been incarcerated since the Child was removed into DCS custody, such that placing the Child with Father was not possible.

On the other hand, testimony during trial revealed that in the four months that the Child had been in DCS custody, DCS had already removed the Child from his first foster home placement. Mr. Rowland testified that the first foster parents had "physically disciplined" the Child by "spanking him on the bottom" such that DCS decided to remove the Child from that home "immediately." The instability and alleged abuse suffered by the Child at the first foster home and the fact that DCS had already had to place the Child into a second foster home only a month after removal could, in some instances, weigh against termination relative to factors (A) and (B).

However, despite the difficulty with the first foster family, Mr. Rowland testified that the Child had been "doing great" in his second foster placement in the months leading up to the trial. Mr. Rowland testified that the Child had become potty trained, had been enrolled "in a Pre-K program where he [was] doing excellent," and had improved in his behavior such that he was no longer "physically combative" as he had been at the time of removal. After carefully considering the evidence as it pertains to these factors, we determine that factors (A) and (B) do apply and weigh in favor of termination as to both parents.

Regarding factor (H)—whether the child has created a healthy parental attachment with another person or persons in the absence of the parent—Mr. Rowland's testimony concerning the Child's second foster placement was that the Child's relationship with the foster family was positive and that he had been "able to go on vacation with the foster parents." Mr. Rowland found it significant that the Child had "not asked about the adoptive parents since entering custody." Upon review, we determine that this evidence indicates that the Child was beginning to bond with and was creating healthy parental attachments with his second foster family. Factor (H) weighs in favor of termination for both parents.

Concerning Factor (L)—whether DCS has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the protective custody of DCS—we agree with the trial court that this factor does not apply with respect to Father because he had been incarcerated continuously between the time of removal and the termination trial. However, upon careful review, we determine that factor (L) weighs against termination as to Mother. The evidence presented at trial demonstrated that Mother was compliant with DCS in completing the requisite mental and parenting assessments but that DCS did not wait to receive the results of those assessments to determine whether Mother could benefit from DCS assistance before filing its petition to terminate her parental rights. Furthermore, Mr. Rowland testified that he did not visit Mother until September 14, 2024, nearly three months after the Child had been removed into DCS custody. When he did visit with Mother in her home, Mr. Rowland testified that he had observed that the house remained "in disarray, cluttered" and that he had informed Mother

16

about—and she was amenable to—assistance DCS could provide in the form of "homemaker services." Despite this, Mr. Rowland acknowledged that he did not follow up with Mother to have her sign a release to receive a referral for homemaker services. Factor (L) weighs against termination of Mother's parental rights.

The trial court determined that factor (C)—whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs—weighed in favor of termination as to both parents based upon the testimony and exhibits presented concerning the ground of severe child abuse. We agree with the trial court concerning factor (C). For the same reasons, we agree with the trial court that factors (J) and (P) also weigh in favor of termination. As the trial court stated, the evidence demonstrated that Mother and Father had "continued to engage in criminal activity and alcohol and substance abuse" and that the Child's "basic needs were not being met in the home[.]"

With respect to factor (N)—whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child—the trial court determined this factor weighed in favor of termination, noting that the parents kept "multiple firearms" that "were within reach of the [then] four-year-old [C]hild." The trial court stated that these firearms were "laying out throughout the home" and noted Detective Humphreys' testimony that "several were loaded." Respecting factor (O)—whether the parent has ever provided safe and stable care for the child or any other child—the trial court similarly found that this factor weighed in favor of termination as to both parents because "the presence of multiple firearms made the home unsafe." The trial court clarified that while "having and owning firearms is not against the law and does not automatically pose a risk of harm to a child," the firearms in this instance "were not put away and were within reach" of the Child. The trial court determined that the presence of "multiple firearms," some loaded and within reach of the Child, constituted a safety hazard. *Cf. In re Roderick R.*, No. E2017-01504-COA-R3-PT, 2018 WL 1748000, at *3 (Tenn. Ct. App. Apr. 11, 2018) (describing the requirements of a permanency plan that stated that in the mother's home, the presence of, *inter alia*, unsecured firearms and "clutter" were deemed to be "safety concerns" and "barriers" to reunification). The evidence preponderates in favor of the trial court's findings relative to factors (N) and (O).

The trial court determined that factor (P)—whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive—and factor (Q)—whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive—applied and weighed in favor of termination as to both parents. For the reasons stated above concerning the ground of severe child abuse and several of the other factors, we agree. The trial court found that factor (R) also applied and weighed in favor of termination as to both parents because "there were multiple firearms and drugs" within

17

reach of the Child. The evidence preponderates in favor of the trial court's finding concerning factor (R).

For the above-stated reasons, we affirm the trial court's conclusion that clear and convincing evidence demonstrated that termination of Mother's and Father's parental rights was in the best interest of the Child.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's and Father's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed one-half to appellant, Arlan P., and one-half to the appellant, Sheila P.

s/Thomas R. Frierson, II

THOMAS R. FRIERSON, II, JUDGE

18